IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

DARREN LEE NORMAN                                                                    PLAINTIFF

V.                                        CASE NO. 3:17-cv-03069

JAIL ADMINISTRATOR BRAD LEWIS;
OFFICER RYAN THOMPSON;
and OFFICER PHILLIP KRUG                                                        DEFENDANTS

## MEMORANDUM OPINION AND ORDER

Plaintiff Darren Lee Norman filed this civil rights action pursuant to 42 U.S.C.

§ 1983. He proceeds *pro se* and *in forma pauperis*. Plaintiff currently is incarcerated

in the Pine Bluff Unit of the Arkansas Department of Correction.

The events at issue in this case occurred at the Baxter County Detention Center

("BCDC"). Plaintiff has named as Defendants Jail Administrator Brad Lewis, Officer Ryan

Thompson, and Officer Phillip Krug. During a seizure Plaintiff suffered on August 19,

2014,[1] he maintains that Officers Thompson and Krug used excessive force against him

when they utilized a technique known as a sternum rub on him three separate times,

causing him physical injury. Plaintiff also maintains he did not receive adequate medical

care while detained at the BCDC.

The case is before the Court on Defendants' Motion for Summary Judgment (Doc.

45). Plaintiff has responded, *see* Doc. 50, and the Motion is now ready for decision.

---

[1] Plaintiff alleges the seizure occurred on August 18, 2014; however, jail records and the
medical records indicate it occurred on August 19th. (Doc. 47-4, pp. 2, 25). In his
deposition, Plaintiff testified that he was not sure of the date of the seizure. (Doc. 47-7,
p. 20).

# I.   BACKGROUND

Plaintiff was booked into the BCDC on August 14, 2014. (Doc. 47-2, p. 1). He was released on September 1, 2014, for medical reasons. *Id.* at 3. As part of the intake process, Plaintiff indicated that he had a history of three strokes and a traumatic brain injury and that he suffered from seizures, depression, anxiety, and borderline personality disorder. (Doc. 47-4, p. 1). He listed his medications as Gabapentin, Hydroxyzine, Trazodone, Quetiapine, and Divalproex. *Id.* Plaintiff later testified in this lawsuit that he had been diagnosed with epilepsy and had seizures "pretty frequent[ly]," about two or three times a month or more. (Doc. 47-7, pp. 15-16). Plaintiff brought his medications to the jail with him. (Doc. 47-4, p. 25).

On August 16, 2014, Plaintiff sought medical care for chest pain and numbness in his left arm. (Doc. 47-3, p. 1). He filled out an "Inmate Medical Request" form on that date. A note on the form indicates that Plaintiff was examined on August 19, 2014, though the time of day of the examination is not specified. *Id.*

On August 19, 2014, at approximately 6:40 p.m., Plaintiff had a seizure. Officers Thompson and Krug performed sternum rubs[2] on the Plaintiff. Plaintiff has submitted a video[3] of this event. The video shows the following:

---

[2] "A sternum rub is accomplished by applying pressure with the knuckles upon a person's sternum. Not surprisingly, this technique can successfully awaken people from a deep sleep." *Young v. Harrison*, 284 F.3d 863, 866 n.2 (8th Cir. 2002). *See also Scheffler v. Lee*, 2018 WL 4849690, at *2 (6th Cir. Oct. 5, 2018) (describing a sternum rub as "a medical procedure designed to rouse an unresponsive patient").

[3] There is no audio.

**18:40:52** Plaintiff falls to the floor having a seizure.

**18:41:00** Officer Thompson attempts to place a mat under Plaintiff's head.

**18:41:04** Officer Thompson puts Plaintiff on his right side and raises Plaintiff's left arm.

**18:41:18** Officer Thompson walks to a counter a few feet away and leans on it observing Plaintiff.

**18:41:55** Officer Thompson turns Plaintiff onto his back. Officer Krug approaches.

**18:41:58** Officer Krug, with his back to the camera, appears to perform a sternum rub (lasting approximately 3 seconds).

**18:42:02** Officer Thompson performs a sternum rub (lasting approximately 9 seconds).

**18:42:32** Officer Thompson performs a sternum rub (lasting approximately 6 seconds).

**18:43:22** Officer Thompson turns Plaintiff onto his left side.

**18:43:48** Officer Krug walks off screen. Officer Thompson continues to observe the Plaintiff turning him back onto his left side several times.

**18:56:21** Officer Krug arrives back and leans on the counter.

**18:57:54** Officer Thompson appears to be demonstrating the length of the injury to Plaintiff's sternum by holding his hands to his own chest with the hands separated by approximately six to eight inches.

**18:59:30** The paramedics arrive.

**19:00:42** The paramedics are provided with Plaintiff's medication

**19:05:32** Plaintiff is placed on the stretcher. He appears to be conscious.

**19:06:22** Plaintiff is taken out.

Plaintiff was transported to Baxter Regional Medical Center ("BRMC"). (Doc. 47-4, p. 2). He was prescribed Phenytoin.[4] *Id.* at 3. Plaintiff testified that, ordinarily, when he comes out of a seizure, everything is confusing to him. (Doc. 47-7, p. 22). He did not recall having had the seizure, but he remembered waking up in the hospital. *Id.* at 22, 26. He first became aware of the wound caused by the sternum rubs when he woke up. *Id.* at 40. He experienced "a lot of pain" whenever he moved. *Id.* Hospital personnel noted that Plaintiff had an "8cm superficial abrasion over the sternal area." (Doc. 51-1, p. 77).

On August 20, 2016, Plaintiff's mother, Teresa Norman, visited him at the jail. She is a registered nurse with 30 years of experience working in emergency rooms. She described her son's wound as being 8 cm by 3 cm in area. (Doc. 51-1, p. 86). Her husband took photographs of the wound that day, including the following photograph:

---

[4] Phenytoin is an anti-convulsant used to control seizures. https://medlineplus.gov/druginfo/meds/a682022.html (accessed January 9, 2019). Dilantin is the brand name for this drug.



(Doc. 51-51, p. 57). Additionally, Plaintiff submitted several photos of the injury taken during his various trips to the hospital. *See id.* at 70, 73, 76.

According to Plaintiff, the wound would bleed and "stuff would always ooze out through the gauze and [his] shirt would stick to it." (Doc. 47-7, p. 40). Jail staff would give Plaintiff antibiotic ointment, gauze, and tape for the wound. *Id.* Plaintiff also received Ibuprofen or Tylenol for pain relief. *Id.* at 44.

Plaintiff testified that it took "[q]uite a while" for the wound to stop oozing. (Doc. 47-7, p. 41). He testified that the pain from the wound lasted approximately a month. *Id.* at 45. Plaintiff does not believe that the sternum rubs he received affected the seizure

he had on August 19, either positively or negatively.  *Id*. at 51.  However, he still bears

a scar on his chest from the wound caused by the sternum rubs.  (Doc. 51, p. 2).

On August 21, 2014, Jail Administrator Lewis made the following note in Plaintiff's

file:

> When inmate went to Hospital, I was contacted by one of the Paramedics who wanted to speak to a Supervisor.  I called and they wanted us to be aware that who ever did the Sternum Rub on the Inmate had used to[o] much pressure and had rubbed the skin and pulled out Chest Hair and they should not be putting that much pressure when doing this.  I spoke to Cpl Ryan Thompson and he stated he did give the inmat[e] a Sternum rub and also Phillip Krug came in behind him and Gave him a Sternum Rub Also.  I explained to Cpl. Thompson and advised him what was going on and to advise Jailer Krug also.

(Doc. 47-4, p. 25).

With respect to Plaintiff's aftercare at the BCDC, the jail's internal medical records

indicate the following:

- **August 20, 2014**  Plaintiff was provided with anti-bacterial ointment and gauze.

- **August 21, 2014**  Plaintiff was provided hydrocodone crème, bandages, and two Advil.  A note was also made in the file that the wound needed to be checked at every medication call, and Plaintiff should be seen by the nurse the following day.

- **August 22, 2014**  Plaintiff was seen by unidentified medical personnel, and a note was made in the file that the abraded area was 3 cm wide and 10 cm long; the wound was cleansed with betadine, and sterile dressings were applied.

- **August 23, 2014**  A note in the file indicates that Plaintiff's bandages were changed on August 22nd and August 23rd, despite Plaintiff's contention that he was not receiving medical supplies on those days.

- **August 24, 2014**  Plaintiff was seen at the infirmary for a dressing change. His chart noted that the skin around the wound was pink with no inflammation or fluid seen.

- **August 25, 2014** A note on Plaintiff's chart states that he told staff he did not need his bandages changed.

(Doc. 47-4, pp. 25, 27).

Plaintiff also contends that during his incarceration at the BCDC, his medication was distributed at times other than the prescribed times. Plaintiff has provided some examples of this practice. *See* Doc. 50 at 5; Doc. 47-4, pp. 28-49 (medication logs)). He maintains that this practice resulted in him not receiving his medication at sufficiently therapeutic levels.

Plaintiff also asserts that on several occasions, the jailers' conduct was unprofessional. By way of example, Plaintiff states that one jailer referred to him as "a retard," and other jailers laughed at him and made derogatory remarks about him. (Doc. 9 at 9; Doc. 50 at 5).

Plaintiff was seen again for seizures at the BRMC on August 28, 2014, August 31, 2014, and September 1, 2014. (Doc. 47-4, pp. 18, 25-26; Doc. 55-1, pp. 11-12). Plaintiff could not recall all of these incidents. (Doc. 47-7, pp. 27, 30). But on September 1, 2014, the following entry concerning Plaintiff appeared in the BCDC's prisoner log: "PER SHERIFF THIS INMATE NEEDS TO BE OR'ED IMMEDIATELY TO RECEIVE MEDICAL TREATMENT." (Doc. 47-4, p. 26). On that same day, the BRMC sent Plaintiff to Mercy Hospital in Springfield, Missouri. (Doc. 47-7 at 53). He remained hospitalized there from September 1 - 9, 2014. *Id.* at 33; Doc. 51-1 at 68.

Plaintiff was admitted to an inpatient treatment program at Brookhaven Hospital—Neurological Rehabilitation Institute in Tulsa, Oklahoma, on October 24, 2016. (Doc.

51-1, p. 67). He presented with a host of problems, including Post Traumatic Stress Disorder ("PTSD"). *Id.* Plaintiff testified that he becomes anxious whenever he is around law enforcement officers, even in the context of a traffic stop. (Doc. 47-7, p. 60-61). Prior to the sternum-rub incident, Plaintiff sustained a serious shoulder injury as a result of an encounter with an officer in Fulton County. *Id.* at 62. Since then, Plaintiff has experienced anxiety in dealing with law enforcement officials. *Id.* at 61-62. Plaintiff testified he did not know if the PTSD stemmed from the sternum rubs at issue in this case, or from the Fulton County incident, or both. *Id.* at 62.

Plaintiff "believes" Jail Administrator Lewis was present when the sternum rub took place. (Doc. 47-7, p. 56). However, Plaintiff has no evidence that Lewis performed the sternum rub. According to Lewis, Baxter County's policy provides that inmates may "make medical complaints daily for review by qualified medical personnel to ensure appropriate medical attention." (Doc. 47-1, p. 2). Emergency medical services are available 24 hours a day. *Id.* Officers are "trained to respond to medical emergencies and may provide temporary lifesaving care while EMS or other medical personnel are in route. The primary medical provider, however, is the facility medical provider[5] or personnel from an emergency medical service." *Id.* In addition, "[a]ll decisions regarding medications, medical testing, or medical treatment are left to the professional medical judgment of a medically trained physician." *Id.* at 3.

According to jail policy, the facility has entered into a contract with qualified medical personnel. (Doc. 47-6, p. 3). The health services contract is to provide for "both on-

---

[5] The medical care provider is not named. (Doc. 47-4, p. 25; Doc. 47-6, p. 3).

call medical services and for on-site visits by qualified health professionals." *Id.* On-site visits are to be made twice a week. *Id.* The emergency medical plan states that the facility will "contract with at least two licensed physicians to ensure that at least 24-hour on-call coverage by the same is available." *Id.* at 7. Inmates who have medical complaints are to "verbally express" their complaints to jail officers, who are to document the complaints and ensure that they are "referred to medical personnel during their routine visits to the facility." *Id.* at 5.

Officers also receive training in basic first aid. (Doc. 47-1, p. 3). A sternum rub is not part of the training provided. *Id.* However, "officers are trained to assess an inmate's medical needs as much as possible." *Id.* Lewis asserts that "[o]fficers must make an assessment as to whether an inmate is conscious or suffering a medical emergency." *Id.* The jail's emergency medical care policy provides that officers are trained to detect medical emergencies including "signs of unconsciousness or semi-consciousness." (Doc. 51-1, p. 25). According to Lewis: "A sternum rub may be used to determine if a person is conscious by forcefully rubbing knuckles over a person's sternum to see if the person responds to the pain of the stimulus. By its very nature, a correctly applied sternum rub is likely to leave a wound similar to a rub burn on the chest." (Doc. 47-1, p. 4).

Lewis further notes that "[i]t is not uncommon for inmates to refuse communication with officers during a medical event or to fake a medical need." (Doc. 47-1, p. 3). With respect to the incident at issue here, Lewis explains that the incident was reviewed, and it was determined that Officers Thompson and Krug did not violate County policy. *Id.* at

9

4. However, *after* this incident, Lewis claims "it was determined that Baxter County officers would be instructed *not* to use a sternum rub." *Id.* (emphasis added).

## II. LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *Nat'l Bank of Commerce v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *Nat'l Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (citing *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III.   DISCUSSION

Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's "rights, privileges, or immunities secured by the Constitution and laws" of the United States.   To establish a claim under § 1983, Plaintiff must show defendants: (1) acted under color of law; and, (2) caused the deprivation of a right established by the Constitution of laws of the United States.   *Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir. 1999).

### A.   Use of Force

#### 1.   Officers Thompson and Krug

There is no dispute that the sternum rubs were actually administered and that Plaintiff suffered physical injury as a result.   Officers Thompson and Krug contend, however, that they performed sternum rubs in a reasonable manner to determine whether: (1) Plaintiff was suffering from a medical condition and needed emergency medical attention or (2) Plaintiff was capable of responding to stimuli and was being deliberately non-responsive.   They also maintain they are entitled to qualified immunity.

"Government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).   "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'"   *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341-43 (1986)).

"[T]o withstand a motion for summary judgment on qualified immunity grounds, a civil rights plaintiff must (1) assert a violation of a constitutional right; (2) demonstrate that the alleged right is clearly established; and (3) raise a genuine issue of fact as to whether the official would have known that his alleged conduct would have violated plaintiff's clearly established right." *Habiger v. City of Fargo*, 80 F.3d 289, 295 (8th Cir. 1996).

The Supreme Court has held that a pretrial detainee's[6] excessive-force claim should be analyzed under an objective reasonableness standard. *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015). The objective reasonableness of a use of force "turns on the 'facts and circumstances of each particular case.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). The determination should be made from the perspective of a reasonable officer on the scene. A court must also account for the "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained," appropriately deferring to "policies and practices that in th[e] judgment" of jail officials "are needed to preserve internal order and discipline and to maintain institutional security." *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 540 (1979)). An action is objectively unreasonable if it is not reasonably related to legitimate governmental interests, such as maintaining order and security. *Id.*

In determining whether a given use of force was reasonable or excessive, the following factors may bear on the issue: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by

---

[6] Plaintiff contends his status as a pretrial detainee is irrelevant; however, different constitutional standards may apply depending on whether a prisoner is a pretrial detainee or a convicted inmate.

the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting. *Id.* The Court in *Kingsley* noted that the list was not exclusive but instead only illustrated the "types of objective circumstances potentially relevant to a determination of excessive force." *Id.; see also Ryan v. Armstrong*, 850 F.3d 419, 427 (8th Cir. 2017).

The use of pain stimuli to determine a person's level of consciousness is a recognized medical technique. As the following article indicates:

> Pain stimulus is a technique used by medical personnel for assessing the consciousness level of a person who is not responding to normal interaction, voice commands or gentle physical stimuli. . . . Pain stimulus can be applied either centrally or peripherally . . . Trapezius squeeze, mandibular pressure, supraorbital pressure and sternal rub are four commonly used central stimuli. Central stimuli should always be used when attempting to assess if the patient responds to painful stimuli . . . Central stimuli need to be applied for at least 15 and potentially up to 30 [seconds] in order for the clinician to accurately assess their efficacy. Sternal rub is known for bruising in fair-skinned people hence its use has been discouraged.

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3987201/ (accessed January 8, 2019).

"A sternum rub is accomplished by applying pressure with the knuckles upon a person's sternum." *Young v. Harrison*, 284 F.3d 863, 866 n.2 (8th Cir. 2002). "A sternum rub is a non-trivial, but less than intermediate, level of force because it can be painful and cause bruising, and may in some circumstances, be considered excessive." *Garlick v. Cnty. of Kern*, 167 F. Supp. 3d 1117, 1127 (E.D. Cal. 2016). In *Pardue v. Glass*, 2008 WL 249173, at *22 (W.D. Ark. Jan. 29, 2008), Pardue argued that the performance of sternum rubs on him three separate times while he was in a restraint chair

constituted excessive force. *Id.* Pardue suffered an abrasion to his chest. *Id.* The testimony in that case indicated that the sternum rub was a viable medical procedure. *Id.* Further, there was credible testimony that malingering was common among jail detainees. *Id.* This Court concluded that the sternum rub was used to determine if Pardue was suffering from a medical condition or if he was being deliberately nonresponsive. *Id.* The use of the sternum rub was therefore held not to constitute excessive force under the circumstances of that case. *Id.*

Here, Plaintiff maintains that Officers Thompson and Krug should not have applied any force through the administration of sternum rubs and instead should have waited for Emergency Medical Technicians ("EMT") to determine Plaintiff's level of consciousness. Plaintiff also contends the officers knew the sternum rub had caused injury to his chest and that the injured area was bleeding, yet they applied the sternum rub multiple times. Giving the Plaintiff the benefit of all reasonable inferences and viewing the evidence in the light most favorable to the Plaintiff, the Court concludes that there is a genuine issue of material fact as to whether excessive force was used under the circumstances. In so holding, the Court notes that the Defendants did not submit the affidavits of Officer Thompson, Officer Krug, or any medical personnel.

The question now becomes whether "the right was clearly established at the time of the violation." *Robinson v. Payton,* 791 F.3d 824, 828 (8th Cir. 2015); *see also Krout v. Goemmer,* 583 F.3d 557, 564 (8th Cir. 2009) ("Unless the answer to both these questions is yes, the defendants are entitled to qualified immunity."). To determine if Plaintiff's right was clearly established at the time of the alleged deprivation, the Court

"must . . . examine the information possessed by the governmental official accused of wrongdoing in order to determine whether, given the facts known to the official at the time, a reasonable government official would have known that his actions violated the law." *Langford v. Norris*, 614 F.3d 445, 461 (8th Cir. 2010). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of preexisting law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

There are few cases involving the use of pain stimuli by jailers to determine consciousness, and even fewer discussing whether the use of a sternum rub could constitute excessive force.[7] Fourth Amendment law in general does not suggest that the use of a medical technique by a jailer constitutes excessive force, even if that medical technique is intended to inflict some amount of pain. "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what

---

[7] The Court also searched for any recent case law that discussed whether a sternum rub was still considered a medically viable procedure. It appears the most recent federal appellate case mentioning sternum rubs is *Sheffler v. Lee*, an opinion issued by the Court of Appeals for the Sixth Circuit in October of 2018. 2018 WL 484690 (6th Cir. Oct. 5, 2018). The *Scheffler* Court described the sternum rub as "a medical procedure in which the provider makes a fist and presses his knuckles against an unresponsive patient in an attempt to rouse him." *Id.* at *11. In *Scheffler*, an EMT rather than a jailer performed a sternum rub on a prisoner in an ambulance on the way to a hospital. The Court affirmed the district court's dismissal of the prisoner's battery claim against the EMT—which stemmed entirely from the application of the sternum rub. Similarly, in the Eighth Circuit, the most recent case to mention sternum rubs (albeit only in passing) was *United States v. Schoenborn*, 793 F.3d 964, 965-66 (8th Cir. 2015). That case involved a police officer who used a sternum rub on an assault victim in an attempt to rouse the victim from unconsciousness. The Eighth Circuit matter-of-factly described the sternum rub as a "technique[] that [is] used to cause a reaction in response to pain," and did not opine the technique's reasonableness. *Id.*

he is doing violates that right. In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal punctuation marks and citations omitted). In this case, a reasonable officer would not have understood that the use of sternum rubs violated the Plaintiff's Fourth Amendment right to be free from the use of excessive force. Officers Thompson and Krug are entitled to qualified immunity on this claim.

### 2. Jail Administrator Lewis

With respect to Lewis, there is no allegation that he was personally involved in the use of force that is at issue in Plaintiff's case. While Plaintiff "believes" Administrator Lewis was present during the application of force, Plaintiff admits he was unconscious during the entire incident and does not know if Lewis was actually present. It also bears mentioning that Lewis never appears in the jail's video recording of the incident.

"To establish personal liability of [a] supervisory defendant[], the plaintiff must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of his constitutional rights." *Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007) (internal punctuation marks and citation omitted). The summary judgment record contains no such evidence. Further, Plaintiff's reliance on provisions of the Arkansas Jail Standards to establish liability is misplaced. Violations of the Arkansas Jail Standards, or of the jail's own policies, do not equate to violations of the Constitution. *See, e.g., Phillips v. Norris*, 320 F.3d 844, 847 (8th Cir. 2003) (failure to follow state law or policy does not in and of itself state a constitutional claim).

As there is no basis for a personal capacity claim against Lewis, this claim will be

dismissed.

### 3. Official Capacity Liability

Plaintiff has also asserted an official capacity claim against the Defendants. "A suit against a county official in his official capacity is the equivalent of a suit against the county itself." *Doe v. Washington Cnty.,* 150 F.3d 920, 923-24 (8th Cir. 1998). To establish an official capacity claim, Plaintiff must allege the existence of a Washington County custom or policy that was the moving force behind, or caused, the alleged constitutional violation. *Rogers v. City of Little Rock,* 152 F.3d 790, 800 (8th Cir. 1998). Plaintiff has not done so. No official capacity claim is stated.

A local government may also be held liable if the failure to train or supervise the offending actor caused the deprivation. In *Parrish,* the Court set forth the requirements to establish governmental or official capacity liability based on a failure to train. *Parrish v. Ball,* 594 F.3d 993, 997 (8th Cir. 2010). It stated that a government may be subject to liability for inadequate training of its employees where:

> (1) the [county's] . . . training practices [were] inadequate; (2) the [county] was deliberately indifferent to the rights of others in adopting them, such that the "failure to train reflects a deliberate or conscious choice by [the county]"; and (3) an alleged deficiency in the . . . training procedures actually caused the plaintiff's injury.

*Id.* (citations omitted).

Even where it is established that only minimal training is received, "that finding alone will not satisfy a § 1983 claim for failure to train." *Id.*

> Instead, Plaintiff must demonstrate that in light of the duties assigned to specific officers . . . the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that

17

the policymakers of the [county] can reasonably be said to have been deliberately indifferent to the need.

*City of Canton v. Harris*, 489 U.S. 378, 390 (1989).

Plaintiff has made no factual showing that is sufficient to survive summary judgment on a failure-to-train claim. He does not dispute the fact that part of the jail standards training includes basic first aid techniques. Additionally, he admits that Officer Thompson was certified in the areas of basic life support or cardiopulmonary resuscitation. Plaintiff's argument is that the officers should have been trained to wait on an EMT rather than attempt on their own to determine whether an inmate is conscious.

The summary judgment record does not contain any evidence of a deficiency in the training of deputies or suggest a causal relationship between the failure to train and the alleged constitutional violation. The Court does "not believe that there is a patently obvious need to train an officer not to" use excessive force against a detainee. *Cf. Parrish*, 594 F.3d at 999 (no "patently obvious need to train an officer not to sexually assault women, especially where there is no notice at all that such behavior is likely"); *see also Kennedy v. Blankenship*, 100 F.3d 640, 643 (8th Cir. 1996) (failure to follow policy does not state a claim for relief under 42 U.S.C. § 1983).

Finally, Plaintiff asserts an official capacity claim based on Lewis's alleged failure to supervise. Plaintiff also maintains that Lewis failed to properly investigate or discipline officers in response to their use of the sternum rub. Plaintiff points out that neither Officer Thompson nor Officer Krug were disciplined for their actions in this case.

The summary judgment record contains no evidence of a custom, policy, or widespread practice of failing to supervise deputies or failing to investigate use-of-force complaints. A single incident that resulted in an outcome not satisfactory to the Plaintiff does not demonstrate that Baxter County had notice that its supervision of the use of force by deputies, or its investigation of use-of-force complaints, was so lacking that the

County was on notice that its procedures were inadequate and likely to result in a constitutional violation. *Parrish*, 594 F.3d at 999. For these reasons, there is no basis for official capacity liability on Plaintiff's excessive-force claim.

## B. Denial of Medical Care

### 1. Officers Thompson and Krug

Defendants assert that once they had knowledge that Plaintiff's health was at risk, they performed the sternum rubs, determined Plaintiff was unconscious, and summoned emergency medical personnel. Defendants argue that the existence of the injury itself shows that they took action and were not deliberately indifferent to Plaintiff's serious medical needs.

The Eighth Amendment prohibition of cruel and unusual punishment prohibits deliberate indifference to prisoners' serious medical needs. *Luckert v. Dodge Cnty.*, 684 F.3d 808, 817 (8th Cir. 2012); *see also Estelle v. Gamble,* 429 U.S. 97, 106 (1976). The deliberate indifference standard includes "both an objective and a subjective component: 'The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000) (quoting *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)). The Eighth Circuit applies the deliberate indifference standard to both pretrial detainees and convicted inmates. *Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014).

Plaintiff contends that the officers' use of the sternum rub amounts to deliberate indifference. He asserts that the use of the sternum rub has long been discouraged as a method to assess consciousness, in part because of the likelihood of causing physical injury. Defendants maintain the sternum rub was used to assess Plaintiff's level of consciousness. Plaintiff does not dispute this. The fact that a sternum rub may no

longer be the favored technique for assessing consciousness does not mean that it is not a recognized medical technique. Further, the fact that Plaintiff was injured because of its use is "insufficient to establish the state of mind for a claim of deliberate indifference." *See, e.g., Lewis v. Babich*, 2007 WL 957003, *9 (E.D. Mo. Mar. 28, 2007) (in a case in which a sternum rub was used to determine a plaintiff's level of consciousness, the fact that the sternum rub caused injury did not amount to deliberate indifference). There is no assertion that the officers "ignored a critical or escalating situation or that the delay posed a substantial risk of harm" to Plaintiff. *Beyerbach v. Sears*, 49 F.3d 1324, 1327 (8th Cir. 1995). In sum, there is no genuine issue of material fact as to whether Officers Thompson and Krug exhibited deliberate indifference to Plaintiff's serious medical needs.

Plaintiff also contends that the Defendants should have called the EMTs immediately and let them determine whether he needed to be taken to the hospital. The EMTs were called and arrived only 19 minutes after Plaintiff lost consciousness. The delay-in-treatment claim fails because the Plaintiff has not presented any verifying medical evidence that the delay had a detrimental effect on his medical condition. *See, e.g., Laughlin v. Schriro*, 430 F.3d 927, 929 (8th Cir. 2005). Without such evidence, Plaintiff cannot prevail on a delay-in-treatment claim at trial. *Id.*

Additionally, Plaintiff asserts that he was not given his medication at the prescribed times, which caused problems with maintaining therapeutic levels of medication in his bloodstream. Plaintiff believes these problems had an adverse impact on his health in general and on the number of seizures he had. While the Court has been presented with medication logs for the Plaintiff (Doc. 47-4 at 28-49), the officers distributing medication are listed only by officer number. The materials before the Court do not identify the Defendants by officer number. Further, there is no verifying medical evidence in the record that any deviation in the distribution of medication from the prescribed time had a

detrimental effect on Plaintiff's medical condition. For all these reasons, this claim also fails.

### 2. Jail Administrator Lewis

The summary judgment record contains nothing suggesting Lewis was involved in, or even aware of, Plaintiff's need for medical care, his medication schedule, or variances in the distribution of his medication. There is simply no basis on which to find that Lewis was deliberately indifferent to Plaintiff's serious medical needs. The claim is therefore dismissed.

### 3. Official Capacity Claims

As discussed above, a government entity may be held liable only when its official policy or custom was the moving force behind the constitutional violation. *Polk Cnty. v. Dodson*, 454 U.S. 312, 326 (1981). Plaintiff alleges the policy of allowing jailers, rather than trained medical personnel, to distribute medication violates his rights. This does not state a claim of constitutional dimension. *See, e.g., Griggs v. Livermore*, 2014 WL 979197 (W.D. Ark. March 13, 2014) ("There is no constitutional requirement that medication be disbursed only by trained medical personnel."); *Booker v. Herman*, 2006 WL 2457230, *5 (N.D. Ind. Aug. 22, 2006) ("While it might be a good practice, tradition, or even state law to require that only medical staff can deliver medication, the Constitution does not prohibit guards from distributing medication to inmates. This allegation states no claim upon which relief can be granted.").

Plaintiff also fails to allege the existence of a custom or policy that was the moving force behind the violation of his constitutional rights. Instead, Plaintiff merely argues that the Defendants violated jail policies and Arkansas jail standards. *See, e.g., Gardner v. Howard*, 109 F.3d 427, 430 (8th Cir. 1997) (no § 1983 liability for violation of prison policy). Plaintiff's argument, even viewed in the light most favorable to him, does not establish

Plaintiff's argument, even viewed in the light most favorable to him, does not establish liability on the part of Baxter County. Defendants are therefore entitled to summary judgment on the official capacity claims.

## C. Unprofessional Conduct

Plaintiff's last contention is that Officers Thompson and Krug engaged in unprofessional conduct because they were laughing and joking about him during the sternum rubs and when he returned from the hospital. As noted above, the video contains no audio. It does appear that Officer Thompson is smiling broadly and at one point puts his head back; however, there is no way to determine if the officers were, in fact, laughing and joking about the Plaintiff during the sternum rubs and while they were waiting for the arrival of the EMT. Plaintiff was unconscious the entire time, so he could not have seen or heard any such conduct.

If the officers did laugh at Plaintiff and make fun of him when he was suffering a medical emergency (or at any point during his incarceration), the Court agrees that such behavior would be considered unprofessional and inappropriate. However, such conduct does not equate to a violation of the Constitution. *See, e.g., Blades v. Schuetzie*, 302 F.3d 801, 805 (8th Cir. 2002) (no claim stated for use of offensive or racially derogatory words uttered by an official "in the course of his official duties"). Defendants are entitled to summary judgment on this claim.

## IV. CONCLUSION

For the reasons stated, Defendants' Motion for Summary Judgment (Doc. 45) is **GRANTED**, and the case is **DISMISSED WITH PREJUDICE.**

**IT IS SO ORDERED** on this 31st day of January, 2019.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE